Catherine **COURTEMANCHE,**
**et al., Plaintiffs,**

**v.**

**GENERAL SERVICES**
**ADMINISTRATION,**
**et al., Defendants.**

**No. Civ.A. 00–10879–DPW.**

United States District Court,
D. Massachusetts.

Sept. 26, 2001.

As Revised Nov. 13, 2001.

Chester Darling, Michael Williams, Boston, MA, for Catherine Courtemanche, Individually, and as the Coordinator of "Americans to Keep Elian Free", Americans to Keep Elian Free.

Anne G. Depew, Assistant U.S. Attorney, United States Courthouse, Boston, MA, for David J. Barram, Administrator, General Services Administration, Karen Palladino, Director, Program Operations Division of the General Services Administration.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

One who wishes to use federal property administered by the General Services Administration ("GSA") must first obtain a license. Federal Property Management Regulations direct disapproval of any license application if the proposed use is "intended to influence or impede any pending judicial proceeding." The application itself requires that the applicant agree to

"indemnify and save harmless the United States, its agents and employees against any and all loss, damage, claim or liability whatsoever" due to exercise of the license.

The plaintiff applied for such a license in May 2000 to use space immediately outside the John F. Kennedy federal office building in Boston as part of a loosely organized national effort to protest the impending return of Elian Gonzalez to Cuba. A subordinate GSA official initially denied the application on grounds that the intent was to influence a federal appellate court hearing scheduled for the next day in Atlanta. On administrative appeal within GSA, the judicial proceedings ground was abandoned by a senior GSA official, who nevertheless declined to grant the license because the plaintiff refused to sign the indemnification/hold harmless provision. The plaintiff thereafter conducted her protest on City of Boston property adjacent to the JFK Building.

The plaintiff continues to press the declaratory judgment action she initiated before the protest to contest GSA's denial of her application. She characterizes that denial as an unconstitutional burden on her First Amendment rights. Following completion of discovery, the defendants now seek summary judgment on grounds that (1) plaintiff's challenge to the judicial proceedings provision is not ripe; (2) plaintiff lacks standing to challenge that provision or the indemnification/hold harmless provision; and (3) plaintiff's challenge to the indemnification/hold harmless provision is moot. In the event plaintiff is found to survive their ripeness, standing and mootness challenges, the defendants seek summary judgment determining the application requirements constitutional, even if, as the defendants are willing to concede solely for purposes of this motion,

the space immediately outside the JFK Building constitutes a public forum.

# I. BACKGROUND

## A. The Parties

Plaintiff Catherine Courtemanche,[1] a resident of Brookline, Massachusetts, was the Boston Coordinator for Americans to Keep Elian Free. Americans to Keep Elian Free was a grassroots organization formed for the purpose of organizing nationwide demonstrations on one particular day to support the rights of Elian Gonzalez in an effort to prevent his return to Cuba. The organization no longer exists.

The defendant GSA is the federal agency that administers much of the property owned by the United States. The National Administrator of GSA and the Director of the Program Operations Division at the office of the GSA Regional Administrator in Boston are also named as defendants.

## B. Factual History

1. *The License Terms*—To request a license to use federal property administered by GSA, parties must fill out a GSA application, detailing various aspects of the proposed use, including the time, date, and number of people expected. Every applicant must also execute an indemnification/hold harmless provision, which is on the second page of GSA's application form and requires a separate signature assenting to the terms. The provision states that:

> The licensee shall indemnify and save harmless the United States, its agents and employees against any and all loss, damage, claim or liability whatsoever, due to personal injury or death, or damage to property of others directly or

---

1. Catherine Courtemanche is now Catherine Van Arnam; for consistency within this Memorandum I will continue to refer to her as Courtemanche, her name when she made application to the GSA.

indirectly due to the exercise by the licensee of the privilege granted by the obligations of said license.

The application also provides:

The applicant assumes all responsibility for clean-up of the grounds, for providing trash containers, and for arranging disposal of the trash. The Federal Government cannot provide electricity for operation of the applicant's equipment, nor are restrooms and similar facilities available. If necessary, portable restroom facilities may be authorized, at the applicant's expense, if the applicant arranges for the removal before the beginning of the next workday.

All licenses issued for the use of space immediately outside the JFK Building in Boston have contained an applicant's signature on the indemnification/hold harmless provision.

2. *The "Elian" Application*—On May 1, 2000, Courtemanche filed an application for a permit to hold a demonstration regarding Elian Gonzalez on the plaza surrounding the JFK Building on May 10, 2000. The United States Court of Appeals for the Eleventh Circuit was scheduled to hear oral argument in the Elian Gonzalez matter in Atlanta, Georgia on May 11, 2000. Under "Description of Proposed Activity," Courtemanche's application stated, "This will be a peaceful rally in support of Elian Gonzalez' individual rights. We will be waving American flags and singing patriotic American songs." As part of her initial application, Courtemanche signed the indemnification/hold harmless provision.

On Wednesday, May 3, 2000, Michael Franzese, the Building Manager of the JFK Building, notified Courtemanche by letter that her request for a permit was denied, stating:

In accordance with the Federal Property Management Regulations, Section 101–20.404 Paragraph 4 'GSA shall dis-approve or cancel any application if . . . [t]he proposed use is intended to influence or impede any pending judicial proceeding.' Based on the information provided with your application and conatined [sic] on your web page the event was scheduled to be held the day before the 11th Circuit Court of Appeals Hearing.

On Friday, May 5, 2000, Courtemanche faxed a letter to the defendant Karen Palladino, the Director of Program Operations for GSA in Boston, appealing the denial of the May 3rd application. Also on May 5, 2000, Courtemanche informed the GSA Office of Regional Counsel that she was withdrawing her assent to the indemnification/hold harmless provision originally submitted with her permit application.

By letter dated Monday, May 8, 2000, Palladino notified Courtemanche that GSA would be able to issue a permit for the rally but that Courtemanche's rescission of her agreement to the indemnification/hold harmless provision rendered the permit application defective. Accordingly, Palladino informed Courtemanche that GSA was denying her permit application because of her refusal to sign the indemnification/hold harmless provision. GSA's Regional Counsel informed Courtemanche's counsel that day, however, that GSA would grant the permit provided that the defect—the refusal to sign the indemnification/hold harmless provision—was remedied.

Courtemanche filed this complaint seeking declaratory and injunctive relief against the judicial proceedings and indemnification/hold harmless provisions on May 8, 2000. I allowed her motion for a preliminary injunction requiring issuance of the license on May 9, 2000, on condition that, without prejudice to her challenge, she assent to the indemnification/hold harmless provision in order to maintain

the respective positions of the parties pending this litigation. Courtemanche unsuccessfully appealed that ruling on an interlocutory basis to the United States Court of Appeals for the First Circuit.

Because Courtemanche continued to refuse to assent to the indemnification/hold harmless requirement, Americans to Keep Elian Free was unable to hold its rally on the federal property surrounding the JFK Building.

In conjunction with her application to GSA, however, Courtemanche had applied for, and received, a permit from Boston City Hall to use City Hall Plaza as "spillover space" for the rally. She also received a permit from the Boston Transportation Department to use the sidewalk in front of City Hall. The May 10, 2000 rally in Boston was ultimately held in front of City Hall on property owned by the City of Boston adjacent to the JFK Building Plaza.

## II. THRESHOLD CHALLENGES TO THE COMPLAINT

The defendants seek to avoid review of the merits of plaintiff's claims by presenting three threshold challenges to her complaint: ripeness, standing and mootness. I address each of these arguments in turn.

### A. Ripeness (Judicial Proceedings Provision)

■ The ripeness doctrine is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Ernst & Young v. Depositors Economic Protection Corp.*, 45 F.3d 530, 535 (1st Cir.1995) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). The ripeness doctrine exists primarily to avoid adjudication of merely hypothetical disputes. *Mass Ass'n of Afro–American Police, Inc. v.*

*Boston Police Dept.*, 973 F.2d 18, 20 (1st Cir.1992).

■ A two-part test has been established to assess ripeness in the context of a declaratory judgment action. *See Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507. The court must consider (1) "the fitness of the issue for immediate review," and (2) "the hardship to the litigant should review be postponed." *Riva v. Commonwealth of Mass.*, 61 F.3d 1003, 1009 (1st Cir.1995). Ordinarily, both prongs must be satisfied in order to demonstrate ripeness. *See Stern v. United States District Court for the District of Massachusetts*, 214 F.3d 4, 10 (1st Cir.2000) (citing *Ernst & Young*, 45 F.3d at 535), *cert. denied*, 531 U.S. 1143, 121 S.Ct. 127, 148 L.Ed.2d 954 (2001). The First Circuit, however, has acknowledged that there may be "some sort of sliding scale under which, say, a very powerful exhibition of immediate hardship might compensate for questionable fitness...." *Ernst & Young*, 45 F.3d at 535.

### 1. *Fitness for Review*

■■ The "fitness for review" inquiry examines whether the issue presented is purely legal, whether the challenged governmental action is final, *Tutein v. Daley*, 116 F.Supp.2d 205, 207 (D.Mass.1999), and "the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Ernst & Young*, 45 F.3d at 535 (citing *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 364 (1st Cir.1992)). The First Circuit has deemed the critical question under this prong to be whether the claim involves "uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all." *Mass Ass'n of Afro–American Police*, 973 F.2d at 20; *see also Riva*, 61 F.3d at 1009; *Ernst & Young*, 45 F.3d at 537 (claim concerning a purely legal question is not ripe for adjudication if "the anticipated events and injury are simply too remote to

justify contemporaneous adjudication"). A claim that "depends upon future events that may never come to pass, or that may not occur in the form forecasted," lacks ripeness. *Ernst & Young*, 45 F.3d at 537 (citations omitted).

■ The defendants contend that Courtemanche's challenge to the judicial proceedings provision is not fit for judicial review because GSA ultimately denied the permit application based on Courtemanche's refusal to sign the indemnification/hold harmless provision rather than on the judicial proceedings provision. Accordingly, defendants contend any claim involving the judicial proceedings provision "necessarily involves speculative facts and a purely hypothetical record."

Courtemanche for her part contends that the judicial proceedings provision, Fed. Property Mgmt.Regs. § 101–20.403 ¶ 4, is a blanket ban on expressive activity intended to influence any judicial proceeding and therefore a factual record is unnecessary. She further argues that because the GSA originally denied her license application based on the judicial proceedings provision, the fact that it was later denied on other grounds is irrelevant because "the facts under which the GSA will apply this provision are known to this Court."

It is undisputed that defendants abandoned the judicial proceedings provision as justification for denying the permit after the initial decision was appealed to Palladino. Therefore, the issue is whether, notwithstanding the fact that the GSA did not ultimately rely on the judicial proceedings provision to deny Courtemanche's permit application, plaintiff's First Amendment challenge to the clause is nevertheless now fit for review. In light of the Supreme Court's treatment of restrictions on First Amendment activity to prevent disruption of judicial proceedings, I believe the answer is unequivocally no.

■ It is well-settled that the normal functioning of public facilities is a "substantial government interest" sufficient to warrant reasonable restrictions on speech. *United States v. Bader*, 698 F.2d 553, 555 (1st Cir.1983) (citing *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965)). The Supreme Court has upheld laws regulating protests near a courthouse on the basis of the State's "legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create." *Cox v. Louisiana*, 379 U.S. at 562, 85 S.Ct. 476. To prevent "influence or domination by either a hostile or friendly mob," the Court declared that, "[a] State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence." *Id.*

■ A state may also enact regulations to "protect the judicial process from being misjudged in the minds of the public." *Id.* at 565, 85 S.Ct. 476. The Court noted that, because of the possibility that a court, while remaining in fact uninfluenced by protests and picketing, might nevertheless coincidentally adopt the position supported by courthouse demonstrators, "[a] State may protect against the possibility of a conclusion by the public ... that the judge's action was in part a product of intimidation and did not flow only from the fair and orderly working of the judicial process." *Id.* (citation omitted).

The *Cox* Court, in both the majority opinion and Justice Black's separate opinion, referenced the significance of proximity of protesters to the courthouse in which the judicial proceeding they were hoping to influence was being held. The majority stated that, "a group of demonstrators parading and picketing *before a courthouse where a criminal charge is pending*, in

protest against the arrest of those charged, may be presumed to intend to influence judges, jurors, witnesses or court officials," *Id.* at 567, 85 S.Ct. 476 (emphasis added). Justice Black noted in his introductory paragraph the State's undisputed power to "protect judges, jurors, witnesses, and court officers from intimidation by crowds which seek to influence them by picketing, patrolling, or parading *in or near the courthouses in which they do their business . . . ." Id.* at 575, 85 S.Ct. 476. (emphasis added). Justice Black also observed that: "Justice cannot be rightly administered, nor are the lives and safety of prisoners secure, where throngs of people clamor against the processes of justice *right outside the courthouse or jailhouse doors." Id.* at 583, 85 S.Ct. 476.

Roughly two decades later, in *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), the Supreme Court reiterated these principles when summarizing, with apparent approval, the government's argument that:

> Courts are not subject to lobbying, judges do not entertain visitors in their chambers for the purpose of urging that cases be resolved one way or another, and they do not and should not respond to parades, picketing or pressure groups. Neither . . . should it *appear* to the public that the [courts are] subject to outside influence or that picketing or marching, singly or in groups, is an acceptable or proper way of appealing to or influencing the [courts].

*Id.* at 183, 103 S.Ct. 1702 (emphasis in original).

The Court in *Grace,* nevertheless, struck down a federal law prohibiting display of flags, banners, or devices on the public sidewalks around the Supreme Court building, noting that the government's right to restrict expressive conduct in such places is "very limited," *id.* at 177, 103 S.Ct. 1702.

It is apparent from *Cox* and *Grace* that expressive activity on courthouse grounds designed or appearing to influence or impede the conduct of those participating in the business of the building may be restricted. Yet *Grace* makes clear that regulation of activity on sidewalks surrounding the courtroom grounds, when "[t]here is nothing to indicate to the public that [they] are part of the [court] grounds or are in any way different from other public sidewalks in the city" will receive different—and exacting—treatment under the First Amendment. *Id.* at 183, 103 S.Ct. 1702.

Invocation of the fact of pending judicial proceedings as a justification to constrain expressive activity must turn on a careful analysis of where the relevant proceeding is located, how those involved in that proceeding approach and function at that location and whether the expressive activity will be conducted within the curtilage of the facility where the proceedings and its participants will be found. Plainly, Palladino was right in declining to rely on Franzese's reference to the judicial proceedings provision to deny a permit for use of property some hundreds of miles from the relevant judicial proceeding. But a materially different circumstance would be presented if expressive activity at the entry to the JFK building were, for example, directed to participants in Social Security or Immigration proceedings then being conducted before Administrative Law Judges in that building.

Where, as here, the defendants have abandoned the position that the judicial proceedings provision could bar the rally from occurring as planned on federal property and the circumstances in which the judicial proceedings provision could in the future be relied upon to deny a licensee are contingent upon an evaluation of the who, what and where of the relevant judi-

cial proceeding, the constitutionality of the judicial proceedings provision is not fit for judicial review on its face.[2] Courtemanche's claim depends upon a future event that may never come to pass, *see Ernst & Young,* 45 F.3d at 537: that GSA will deny her permit application on grounds of the judicial proceedings provision because of some then pending judicial proceedings in proximity to some then planned rally. Courtemanche's judicial proceedings provision claim is simply too speculative and too premature to satisfy the fitness prong of the *Abbott Labs* test.

### 2. *Hardship*

 An inquiry into the hardship that may result from denying judicial review typically turns upon whether "the challenged action creates a 'direct and immediate' dilemma for the parties." *Riva,* 61 F.3d at 1010 (citation omitted). Although a showing of direct and immediate harm is generally necessary, "other kinds of injuries occasionally may suffice." *Ernst & Young,* 45 F.3d at 536. For example, "even when the direct application of a statute is to some degree remote or contingent, its collateral effects may inflict present injuries that, though indirect, are adequate to support a finding of ripeness." *Id.*

Courtemanche has not demonstrated that she will suffer any hardship if judicial consideration is withheld regarding the judicial proceedings provision. She faces no direct or immediate harm in connection with the judicial proceedings provision, because the clause has yet to cause denial of a license for her. Nor do I find that a declaratory judgment would be useful to forestall other potential injuries in this context. Given the highly fact intensive quality to any evaluation of the use of the Judicial Proceedings Clause to deny a license, any declaratory relief would not be of any "practical assistance in setting the underlying controversy to rest." *Ernst & Young,* 45 F.3d at 537 (quoting *State of Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 693 (1st Cir.1994)).

### 3. *Conclusion*

I conclude that Courtemanche's claim concerning the constitutionality of GSA's Judicial Proceedings Clause is not ripe for adjudication and consequently should be dismissed.

### B. *Standing*

 Article III of the Constitution limits the jurisdiction of federal courts to

---

**2.** It is theoretically possible to give the judicial proceedings provision such a broad reading that in the wake of *Cox v. Louisiana* and *United States v. Grace,* it would be unconstitutional on its face. Indeed, the reading that a GSA subordinate initially gave the provision here, which presumably turned on the intent to influence a judicial proceeding a great distance removed from the site of the proposed use, would confront formidable constitutional objections. I decline, however, as did—I infer—more senior GSA officials, to give the language such a vulnerable reading. *See generally New York v. Ferber,* 458 U.S. 747, 769, n. 24, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (faced with an overbreadth challenge, a federal court is obliged to construe a federal statute to avoid constitutional problems); *U.S. v.*

*Johnson,* 952 F.2d 565, 578, n. 11 (1st Cir. 1992); *U.S. v. Acheson,* 195 F.3d 645, 650 (11th Cir.1999). It is plain in light of *Cox* and *Grace* that the term "interfere" in the judicial proceedings provision is only meaningful when given the dimension of proximity, for example, "before a courthouse," "in or near the courthouse," "right outside the courthouse" or on the "grounds" of the courthouse where the pending proceeding is being conducted. Whether a particular use is proposed for a protest which is in that sense within the curtilage of a facility where the targeted pending judicial proceeding and its participants will be found may only be analyzed when and if the provision is applied to a specific situation.

actual cases or controversies. *See Becker v. Federal Election Comm'n*, 230 F.3d 381, 384 (1st Cir.2000) (citing *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). To establish standing to pursue such litigation, a plaintiff must show: (1) that she has suffered or is in danger of suffering some injury that is both concrete and particularized to her; (2) that this injury is fairly traceable to the challenged action of the defendant; and (3) that a favorable decision will likely redress the injury. *Becker*, 230 F.3d at 385 (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

■ It is important to note at the outset that standing is to be "assessed under the facts existing when the complaint is filed." *Becker*, 230 F.3d at 387 n. 3 (citations omitted). There has been some confusion concerning the distinction between questions of standing and questions of mootness. The First Circuit has clarified the issues, explaining, "while it is true that a plaintiff must have a personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter." *Id.* (citing *Steger v. Franco, Inc.*, 228 F.3d 889, 893 (8th Cir.2000) ("standing is based on the facts as they existed at the time the lawsuit was filed"); *White v. Lee*, 227 F.3d 1214, 1236 (9th Cir.2000) (same); *Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636 (D.C.Cir. 2000) (same)).

■ Courtemanche filed her complaint in this action on May 8, 2000, two days before the scheduled date of the rally. At the time Courtemanche brought this action, GSA had already informed her that refusal to sign the provision would result in denial of the permit application, which is in fact what did occur.[3] Thus, as of May 8, 2000, Courtemanche was clearly faced with a concrete and particularized injury—the prohibition of her right to engage in expressive activity—that was "fairly traceable" to her refusal to sign the challenged indemnification/hold harmless provision.[4] *See Becker*, 230 F.3d at 385.

The defendants rely upon *Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), to support their contention that Courtemanche lacks standing to seek a declaratory judgment. That reliance is misplaced. In *Lyons*, the plaintiff alleged that police officers had unconstitutionally applied a chokehold to him, and sought a preliminary injunction significantly curtailing police officers' ability to use chokeholds. The Court held that a past injury does not ordinarily confer standing to seek declaratory or injunctive relief un-

---

3. It is irrelevant for standing purposes that Courtemanche controlled whether or not she received a permit for the rally by virtue of signing the indemnification/hold harmless provision. As the First Circuit has commented, "clearly, one who challenges a governmental action may not be denied standing merely because [her] challenge in a sense stems from [her] own choosing." *Becker*, 230 F.3d at 388. Indeed, the purpose of my action on her preliminary injunction motion was to preserve the issues without compromising the interests of the parties, whichever should prevail.

4. The rally ultimately was not held on federal property, presumably for fear that GSA would have taken action against the protesters if the rally occurred without a valid permit. *See Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."). Because the challenged provision was enforced against Courtemanche and Americans to Keep Elian Free, in that GSA denied Courtemanche's permit application, the ultimate location for the rally does not impact upon the standing analysis.

less the plaintiff demonstrates a sufficient likelihood that he will again be wronged in a similar way, and therefore the *Lyons* plaintiff's standing depended upon whether "he is realistically threatened by a repetition of his experience of October 1976." 461 U.S. at 109, 103 S.Ct. 1660; *see also American Postal Workers Union v. Frank,* 968 F.2d 1373, 1376 (1st Cir.1992) ("because Lyons could not show that an injunction barring future use of the chokehold would provide relief to him, personally, he had no standing to seek that remedy"). The crucial distinction is this: in *Lyons,* the plaintiff alleged only past injury rather than the imminent threat of future injury. As the First Circuit noted in *American Postal Workers Union,* the *Lyons* holding is based on "the obvious proposition that a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past." *Id.* In contrast, Courtemanche brought the present action before the injury occurred. She need not show, therefore, the likelihood of repetition of the injury in order to establish standing.

With respect to the redressability prong of the standing analysis, at the time Courtemanche filed her complaint, a favorable decision likely would have redressed the injury. A judgment holding the indemnification/hold harmless provision unconstitutional would have enabled the rally to proceed as planned and according to terms she sought. As the defendants point out, now that the protest has been held on other property, Americans to Keep Elian Free has disbanded, and Elian has been returned to Cuba, the requested relief will do nothing to redress any injury to the plaintiff, who, understandably, has not chosen to seek damages. However, the First Circuit has held that "this subsequent redressability problem is one of mootness, not standing." *Becker,* 230 F.3d at 389 (citing *Advanced Mgmt. Tech., Inc.,* 211 F.3d at 636).

Accordingly, finding that Courtemanche has standing to challenge the indemnification/hold harmless provision of the GSA permit application, I turn to the mootness question.

## C. Mootness

■■■■ In general, a case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (citations omitted). The mootness doctrine ensures that "a party's interest in the outcome continues to exist throughout the life of the lawsuit. . . ." *Cook v. Colgate,* 992 F.2d 17, 19 (2d Cir.1993) (citations omitted). As with the standing requirement, the mootness doctrine derives from the constitutional requirement that federal courts may decide only actual cases or controversies. Thus, in order properly to invoke federal jurisdiction, an actual case or controversy must exist at all stages of the proceeding and not simply at the date the action is initiated. *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

■■■■ Although Courtemanche had standing to bring this action, in the interim the rally was held, Elian was returned to Cuba and Americans to Keep Elian Free was disbanded. These facts suggest the conclusion that Courtemanche may no longer have a personal stake in the outcome of this action.

■■■■ However, some relaxation of the standards for evaluating mootness, applicable "only in exceptional situations," *Lyons,* 461 U.S. at 109, 103 S.Ct. 1660, is available to permit a court to adjudicate a claim that, though technically moot, is "capable of repetition, yet evading review." *See Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 647 (2d Cir.1998) (quoting *Nebraska Press Ass'n v. Stuart,* 427 U.S.

539, 546, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)). To come within this exception, a party must show that: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy,* 455 U.S. at 482, 102 S.Ct. 1181 (internal quotations omitted); *see Lyons,* 461 U.S. at 109, 103 S.Ct. 1660 (exception applies only where named plaintiff can make reasonable showing that he will again be subjected to the alleged illegality).

In *Becker,* the First Circuit found that a challenge to certain Federal Election Commission debate regulations came within this mootness exception because corporate sponsorship of debates was sure to be challenged again in future elections, yet the short length of the campaign season would make a timely resolution difficult. *Becker,* 230 F.3d at 389 (citing *Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *see also Fulani v. League of Women Voters Educ. Fund,* 882 F.2d 621, 628 (2d Cir.1989); *Johnson v. F.C.C.,* 829 F.2d 157, 159 n. 7 (D.C.Cir.1987)).

The time between applying for a license and a planned rally regarding a matter of topical interest is generally even more compressed than a campaign season, and in light of the comparatively slower pace of litigation, it is highly likely that the question of the constitutionality of GSA's indemnification/hold harmless provision will "evade review" before the time for the protest has passed. As Justice Harlan has

noted, "Timing is of the essence in politics.... [W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 163, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (Harlan, J., concurring).

The second prong is more challenging for this plaintiff. Courtemanche must show a reasonable expectation that she will be subjected to the same action again.[5] At her deposition, Courtemanche stated that before her involvement in Americans to Keep Elian Free, she had never organized any type of rally, nor had she ever applied for permits for any type of rally or demonstration. In the last two years, Courtemanche has not attended any other rallies or demonstrations. To the best of her knowledge, she is not a member of any other organization that holds rallies or demonstrations. These facts notwithstanding, Courtemanche contends that she is "an individual who cares about the actions of the federal government and is the type to demonstrate against those actions of the federal government she does not agree with." For such a "politically active" individual, there is a likelihood she will make further permit applications for future political demonstrations at the JFK building or some other GSA facility.

Despite the relatively weak showing made by Courtemanche, *cf. City News and Novelty, Inc. v. Waukesha,* 531 U.S. 278, 121 S.Ct. 743, 746–47, 148 L.Ed.2d 757 (2001) (finding moot First Amendment challenge by party that "neither now pursues nor currently expresses an intent to

---

5. Plaintiff's memorandum in opposition to defendants' motion for summary judgment appears confused about the second prong of the mootness exception. First, plaintiff's counsel wrongly attempts to shift the burden of proof on this issue to defendants; second, counsel irrelevantly argues that the challenged provision remains in effect and will be enforced against all future permit applicants. The application of this provision to other permit applicants is beside the point for mootness purposes. Courtemanche must show a reasonable expectation that she herself will be subjected to the same permit requirements again.

pursue a license"), I find at least a colorable question whether there is a "reasonable expectation" that she will encounter the same barrier to expressive activity again. Consequently, I find that Courtemanche has at a minimum raised a genuine issue of material fact sufficient to survive summary judgment on mootness grounds.

## III. CONSTITUTIONALITY OF INDEMNIFICATION/HOLD HARMLESS PROVISION

 The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const.Amend. I. Protest speech falls squarely within the protection of the First Amendment's guarantees of freedom of speech and assembly. *See Shuttlesworth,* 394 U.S. at 152, 89 S.Ct. 935 (describing privilege of citizens to assemble, parade, and discuss public questions in streets and parks). However, it is well-settled that the First Amendment does not guarantee unlimited access to government property for expressive purposes. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (government "need not permit all forms of speech on property that it owns and controls"). Whether restrictions on access to public property impermissibly infringe on free speech rights depends largely on the nature of the property at issue. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

### A. Forum Analysis

Under the Supreme Court's forum-based approach, public property is classified into three distinct categories: the traditional public forum, the designated public forum, and the non-public forum. *Id.* at 45–46, 103 S.Ct. 948.

 The **traditional public forum** is found in places such as "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Id.* at 45, 103 S.Ct. 948 (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). The state may enforce a content-based restriction on speech in a traditional public forum only if the regulation is "necessary to serve a compelling state interest," and is "narrowly drawn to achieve that end." *Id.* (citation omitted). Content-neutral time, place, and manner restrictions on speech in a traditional public forum will be upheld if they are "narrowly tailored to serve a significant government interest" and "leave open ample alternative channels of communications." *Id.* (citations omitted).

 The **designated public forum** consists of public property which the government has intentionally opened for use by the public as a place for expressive activity.[6] *Id.* at 45, 103 S.Ct. 948; *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Although a state need not indefinitely retain the open character of a designated public forum, "as long as it does so it is bound by the same standards that apply in a traditional public

---

**6.** A sub-category of the designated public forum is the "limited public forum." *Flamer v. City of White Plains, New York,* 841 F.Supp. 1365, 1373 (S.D.N.Y.1993). A limited public forum is "created when government opens a

non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Id.* (citations omitted).

forum." *Perry*, 460 U.S. at 46, 103 S.Ct. 948.

 A **non-public forum** is public property not open by tradition or designation to the public for expressive activities; it consequently is governed by different standards for evaluating restrictions on expression. *Id.* at 46, 103 S.Ct. 948. Both content-neutral time, place, and manner restrictions and "reasonable" content-based restrictions are permissible in non-public fora, so long as the restrictions are "not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*

The defendants do not ultimately concede that the federal property surrounding the JFK Building is either a traditional or a designated public forum.[7] GSA contends in responding to interrogatories that the JFK Building Plaza is not "commonly used" for protests or rallies and that fewer than five events have occurred on federal property adjacent to the JFK Building since April 2000.[8] Relying on *Cornelius*, 473 U.S. at 804, 105 S.Ct. 3439 ("where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum"), the defendants further contend that because the small area of federal property on the Cambridge Street side of the JFK Building is a means of entrance and exit for the 3500 people who come through the Cambridge Street doorway

each day, the "necessity of controlling the number of people in such a relatively small space certainly weighs against finding the property a public forum."

I do not find these arguments particularly compelling on this record. The plaza immediately outside the JFK Building has a track record of use for rallies and other expressive activity, and the fact that GSA requires a permit as a precondition to use of the property does not compel the conclusion that it is a non-public forum. The plaza is generally open for public use, and is more closely akin to a street or sidewalk than to a non-public forum such as an airport. *Compare Frisby v. Schultz*, 487 U.S. 474, 480–81, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (residential sidewalks are public forum); *United States v. Grace*, 461 U.S. at 179–80, 103 S.Ct. 1702 (sidewalks outside Supreme Court building are public forum) *with Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (airport terminal is non-public forum). As the Supreme Court has noted, "speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum." *Schenck v. Pro–Choice Network of Western New York*, 519 U.S. 357, 377, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (citing *Boos v. Barry*, 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *Grace*, 461 U.S. at 180, 103 S.Ct. 1702).

Their arguments for a non-public forum status for the JFK Building Plaza notwith-

**7.** Indeed, the defendants, citing *United States v. Kokinda*, 497 U.S. 720, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), seem to contend that GSA is subject to a lower level of First Amendment scrutiny simply because it functions as a proprietor that manages government properties. However, the Court in *Kokinda* recognized that the fact that the government is acting as proprietor of public property is not determinative of the level of scrutiny to be applied. Instead, when the government is managing property, the tripar-

tite forum analysis announced in *Perry* remains applicable, and thus the level of scrutiny will be based on the nature of the fora.

**8.** Courtemanche notes that in recent years the JFK Building Plaza has been the site of a public demonstration for a solution to the conflict between Eritrea and Ethiopia; an art exhibition; a press conference regarding trade bills in the Senate; a rally relating to the United States policy toward the Congo; and a fast supporting the Louis Gutierrez bill.

standing, however, the defendants, in the context of the instant motion, are willing to concede *arguendo* that the property at issue here is a designated public forum and defend the indemnification/hold harmless provision within a public forum framework for analysis.

Accordingly, for purposes of this motion, I accept the defendants' *arguendo* concession that the property at issue is a public forum and now turn to the question whether the indemnification/hold harmless provision is a valid time, place, or manner regulation in accordance with the *Perry* standards for restrictions on speech in a public forum.

## B. Fees and Potential Financial Responsibility as a Prior Restraint

The Supreme Court held some time ago that a state may require as a condition to engaging in expressive activity that a permit applicant pay fees to defray government costs directly attributable to the speech activity, *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The *Cox* Court found constitutional a fee that ranged from "$300 to a nominal amount" and that was intended "to meet the expense incident to the administration of the Act and to the maintenance of public order in the matter licensed". 312 U.S. at 576–77, 61 S.Ct. 762. However, courts have since refined the general rule announced in *Cox,* subjecting mandatory license and fee requirements to closer constitutional analysis.

In *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), the Supreme Court set out to resolve a circuit split as to the constitutionality of charging a fee for use of a public forum. *Id.* at 130, 112 S.Ct. 2395. The Court noted that a government ordinance requiring a permit and a fee as a precondition to authorizing speaking, parades, or assemblies in a public forum is to

be treated as a prior restraint on speech and is therefore subject to the scrutiny imposed on other such restraints. *Id. See also, Shuttlesworth,* 394 U.S. at 150–51, 89 S.Ct. 935; *Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 328, 95 L.Ed. 280 (1951); *but see Thomas v. Chicago Park District,* 227 F.3d 921, 923 (7th Cir.2000) (noting "heterogeneity of the practices that the 'prior restraints' formula covers" and expressing "doubt that it can provide much assistance to judges who have to decide a novel case."), *cert. granted,* —— U.S. ——, 121 S.Ct. 2191, 149 L.Ed.2d 1023 (May 29, 2001).

There is a "heavy presumption" against the validity of a prior restraint on speech. *Forsyth County,* 505 U.S. at 130, 112 S.Ct. 2395 (citing *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963)). Notwithstanding this presumption, the Supreme Court in *Forsyth County* recognized that permit and fee requirements may be imposed by the government in order to regulate competing uses of public forums. 505 U.S. at 130, 112 S.Ct. 2395. A permit scheme regulating the time, place, and manner of speech is permissible, so long as it does not "delegate overly broad licensing discretion to a government official," is content-neutral, narrowly tailored to serve a significant governmental interest, and leaves open ample alternatives for communication. *Id.; see also Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

The *Forsyth County* Court specifically considered a facial challenge to a county ordinance that required permits for private demonstrations and other uses of public property and imposed a fee of up to $1,000 to meet the expense of the ordinance's administration and the maintenance of public order. 505 U.S. at 123, 112 S.Ct. 2395. The Supreme Court found the

ordinance to be unconstitutional because it granted unfettered discretion to the county administrator charged with setting the permit fee, *id.* at 132–33, 112 S.Ct. 2395, and because the ordinance, by taking into consideration costs "associated with the public's reaction to" the expressive activity, arguably based the fee in part on the content of the speech. *Id.* at 134, 112 S.Ct. 2395

*Forsyth County* was concerned with fees that are paid directly to the government as a prior condition to obtaining a permit to use public land. Here, because the financial obligation of the indemnification/hold harmless provision is indirect and open ended, a more nuanced analysis is necessary. In pursuing that analysis, I find useful lower court decisions that have applied the relevant principles to evaluate the constitutionality of requiring a permittee to obtain private liability insurance coverage as a condition of using the forum. An insurance requirement poses the same impediment to speech as a prior permit fee because it requires the permit applicant to pay a sum—the insurance premium—as a prerequisite to using the forum for First Amendment activities. By reducing the open ended quality of the risk of indemnification at issue here to the present value of the premium, the actual impact of potential financial responsibility on the exercise of expression can be more readily evaluated.[9] I recognize, of course, that liability insurance functions differently from permit application fees in several key respects. I will address these considerations below as they affect the various *Forsyth County* factors.

The lower courts have generally found mandatory insurance provisions to be unconstitutional prior restraints on speech under various prongs of the *Forsyth County* test. *See, e.g., Eastern Conn. Citizens Action Group v. Powers,* 723 F.2d 1050, 1057 (2d Cir.1983) (invalidating state transportation department's $750,000 liability insurance requirement for political march); [10] *Collin v. Smith,* 578 F.2d 1197 (7th Cir.1978) ($300,000 liability insurance requirement declared unconstitutional), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978); *Wilson v. Castle,* 1993 WL 276959 (E.D.Pa.1993) (insurance requirement declared unconstitutional be-

---

9. I note that at least one court has taken the position that unlike fees paid to the government to reimburse costs actually incurred as a result of the permittee's activities, fees paid to a third-party insurer are not directly related to the administrative expenses incurred by the speech activity, but are for contingencies that may never occur. *See Long Beach Lesbian and Gay Pride, Inc. v. City of Long Beach,* 14 Cal.App.4th 312, 17 Cal.Rptr.2d 861, 876 (1993). That analysis seems simplistic. An insurance premium is simply a liquidated figure to cover the government's potential risk. That risk is by definition contingent because the premium reflects the anticipated cost of the risk and is therefore an ex ante equivalent to the actual cost of damage/liability. The administrative costs presumably find their rough equivalent in costs the government would incur in a more diffuse way than a private insurer if it were a self-insurer. The fact that a premium is paid to a third-party rather than directly to GSA seems largely irrelevant for purposes of analysis.

10. The Second Circuit in *Eastern Conn. Citizens Action Group* found the insurance requirement did not represent the least restrictive means of serving the state's interest in avoiding losses resulting from the plaintiff's activities. 723 F.2d at 1055–56. It is important to note, however, that the "least restrictive means" analysis then employed by the Second Circuit was later rejected by the Supreme Court. *Ward v. Rock Against Racism,* 491 U.S. at 798, 109 S.Ct. 2746 ("Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so.").

cause it was not sufficiently narrowly tailored); *Collin v. O'Malley,* 452 F.Supp. 577, 578–80 (N.D.Ill.1978) (denying motion for stay of order enjoining city from requiring permit holders to obtain public liability insurance and property damage insurance); *Houston Peace Coalition v. Houston City Council,* 310 F.Supp. 457, 461–63 (S.D.Tex.1970) (striking down a liability insurance requirement because it gave unlimited discretion to city official).

The indemnity/hold harmless provision at issue here is technically not the same as an insurance requirement because a permittee can make her own determination whether to obtain third party insurance or face the risk of liability as a self-insurer. However, it is not unreasonable to expect that one faced with unlimited liability as a consequence of the indemnification/hold harmless provision would choose to purchase liability insurance to cover that risk. *See* Eric Neisser, *Charging for Free Speech: User Fees and Insurance in the Marketplace of Ideas,* 74 Geo.L.J. 257, 270–71 (1985). In fact, a principal purpose of insurance is to reduce one's risk of liability by spreading the cost among a large number of insured, only a small number of whom will actually suffer a loss. For purposes of this motion, I will treat as likely that to comply with the indemnification/hold harmless provision a person in Courtemanche's position would choose to obtain liability insurance, if possible.

I now turn to each of the factors identified by *Forsyth County* to evaluate whether there is a triable issue of fact as to the constitutionality of the indemnification/hold harmless provision of the GSA permit application.

■ 1. *Administrative Discretion —* Permit fees and insurance requirements have been struck down due to lack of specificity in the standards prescribed for the insurance and the degree of discretion afforded to city officials. *See Forsyth*

*County,* 505 U.S. at 131–33, 112 S.Ct. 2395 (striking down permit fee requirement because of the unbridled discretion granted the county administrator); *Houston Peace Coalition,* 310 F.Supp. at 461–62 (striking down an insurance requirement where the city attorney had in effect uncontrolled discretion to grant or deny a parade permit by setting the amount and type of liability insurance required). To survive judicial scrutiny, an insurance requirement imposed upon permit applicants must set forth "clear, non-discriminatory and non-discretionary requirements concerning such liability insurance," and be administered on a "non-discriminatory and non-discretionary basis." *Id.* at 462–63. *See also Invisible Empire Knights of the Ku Klux Klan v. City of West Haven,* 600 F.Supp. 1427, 1432–33 (D.Conn.1985) (finding bond requirement unconstitutional due, in part, to lack of adequate standards for determining the amount of the bond required).

■ GSA does not set forth any specific insurance requirement. Instead, the indemnification/hold harmless provision makes the permittee responsible for "any and all loss, damage, claim, or liability" suffered by the United States as a result of the use of the forum. While the level of liability is potentially unlimited, the level of insurance coverage is up to the discretion of the individual applicant. In any event, I cannot find that the provision in any way grants excessive discretion to an administrator.

■ 2. *Content–Neutrality —*Regulations which permit the government to discriminate in public forum on the basis of the content of the expression are suspect. *Forsyth County,* 505 U.S. at 135, 112 S.Ct. 2395. However,

Judicial review takes on a different cast when a statute does not regulate speech per se, but, rather, restricts the time, place, and manner in which expression

may occur. Such laws are less threatening to freedom of speech because they tend to burden speech only incidentally, that is, for reasons unrelated to the speech's content or the speaker's viewpoint. Where that description applies, courts employ a less exacting level of scrutiny, upholding limitations on the time, place, and manner of protected expression as long as "they are justified without reference to the content of the regulated speech, ... are narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information".

*McGuire v. Reilly*, 260 F.3d 36, 43 (1st Cir.2001) (quoting *Clark v. Comm. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). *See also Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 862–64 (9th Cir.2001).

 As the Court explained in *Ward*, the critical question in determining content neutrality is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." 491 U.S. at 791, 109 S.Ct. 2746. A statute may, however, be deemed content-neutral even though it has an incidental effect on some speakers and not others, so long as the reason for the differential treatment is not content-based. *See McGuire v. Reilly*, 260 F.3d at 44; *see also Hill*, 530 U.S. at 719, 120 S.Ct. 2480.

a. *Justification without reference to content*—The indemnification/hold harmless provision imposed upon permit applicants by GSA does not directly place restrictions on either a particular viewpoint or any subject matter that may be discussed by a speaker. It does not draw distinctions based on the subject matter of the proposed gathering, but applies equally to all persons and organizations seeking

a permit, regardless of viewpoint. The language of the provision makes no reference to the content of the message. GSA apparently uses the same permit application across the United States and the record reflects that GSA consistently requires all persons seeking a permit to sign this provision. GSA's interests in protecting the access of employees and the public to the JFK Building and maintaining against wear and tear the spaces it manages are unrelated to the underlying content of the regulated speech.

 However, the provision raises the prospect that third-party insurers will make content-based fee determinations. Although GSA does not require permit applicants to obtain liability insurance, the likely consequence of such a broad indemnification/hold harmless provision is that permittees will seek such coverage to manage uncertain personal liability. And courts have concluded that insurance premiums may vary depending on the content of the demonstrators' message, the controversial nature of the organizations, *see Collin v. Smith*, 578 F.2d at 1209 (insurance condition would prohibit "First Amendment activity, not itself directly productive of the feared injury, by those too controversial to obtain commercial insurance"), or the insurer's anticipation of listeners' hostility to the message, *see Forsyth County*, 505 U.S. at 134–35, 112 S.Ct. 2395 (listeners' reaction to speech is not a content-neutral basis for regulation). The Second Circuit observed with disapproval in *Eastern Conn. Citizens Action Group* that insurance companies often consider factors such as political beliefs, the likelihood of adverse publicity to the insurance company, and the organization's lack of business experience in deciding whether to accept or reject applications for insurance coverage. 723 F.2d at 1056 n. 2.[11]

11. I note that a recent Seventh Circuit case as to which certiorari has been granted, *Thomas* *v. Chicago Park District*, 227 F.3d 921 (7th

The record before me contains no factual information concerning the relationship between the cost of insurance and the nature of the event (including the potential for increased cost due to heckler's opposition). Given the possibility of content-based imposition of fees by third-party insurers identified in the case law and the absence of any evidence negating such practices in the present action, there is a genuine issue of material fact regarding the degree to which third party risk analysis will indirectly import content based decision making into compliance with the GSA indemnification/hold harmless provision.

 b. *Narrow Tailoring* —To survive under public forum analysis, a time, place, and manner regulation must advance a "substantial governmental interest" and be "narrowly tailored" to prevent "no more than the exact source of the 'evil' it seeks to remedy," *Edwards*, 262 F.3d at 863 (quoting *Frisby*, 487 U.S. at 485, 108 S.Ct. 2495), while leaving open ample alternative channels of communication. *Forsyth County*, 505 U.S. at 130, 112 S.Ct. 2395; *Renton*, 475 U.S. at 50, 106 S.Ct. 925. The narrow tailoring requirement is satisfied where the regulation promotes "a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799, 109 S.Ct. 2746. The regulation need not be the least restrictive means of serving the government interest, but the means chosen may not "burden substantially more speech than is necessary to further" that interest. *Id.; see also Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 187–88 (1st Cir.1996) (citations omitted).

Courts considering the constitutionality of an insurance requirement as a condition to engaging in protected speech have required a showing that the burdensome effects of the insurance requirement are necessary and directly related to the accomplishment of legitimate governmental purposes. *See Collin v. Smith*, 447 F.Supp. 676, 685 (N.D.Ill.1978) (noting lack of record evidence that municipality had ever been threatened with damage by a public assembly which would have been prevented or alleviated by an insurance requirement), *aff'd*, 578 F.2d 1197 (7th Cir.), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978).

In determining whether a permit scheme is narrowly tailored to serve a significant government interest, I must look to the "fit" between the regulation and the stated purposes behind it. *Gerritsen v. City of Los Angeles*, 994 F.2d 570, 577 (9th Cir.1993) (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)). GSA's stated purposes for its permit scheme are to ensure that employees and visitors to the JFK Building are not exposed to unnecessary risks in their access to the building, to protect public property by holding those who use it financially responsible for

---

Cir.2000), *cert. granted*, —— U.S. ——, 121 S.Ct. 2191, 149 L.Ed.2d 1023 (2001), determined that an indemnification requirement with an insurance dimension can be content-neutral. In *Thomas*, the contested regulation required permit applicants to obtain a $1 million insurance policy to indemnify the park district against liability arising from a rally. 227 F.3d at 925. The Seventh Circuit held this requirement did not constitute an impermissible prior restraint, finding there

(presumably on the basis of record evidence), "the amount of insurance required is not ... influenced by[ ] the nature of the event, and specifically by whether it involves controversial expressive activity likely to incite violence by onlookers or opponents. The required amount and the cost of the insurance depend only on the size of the event and the nature of the facilities involved in it (a bandstand, stage, tents, and so forth)." 227 F.3d at 925.

272

damage, and to shield the government from liability.

### 1. *Access to Building*

█ The defendants note that the plaza surrounding the JFK Building is relatively small. The JFK Building has only two public entrances. The Cambridge Street entrance is accessed only by crossing the property, and people enter and exit the building through that entrance approximately 3500 times per day. The government's interest in ensuring public safety and order and promoting the free flow of traffic on streets and sidewalks constitutes a significant interest. *See Wells v. City & County of Denver*, 257 F.3d 1132, 1148 (10th Cir.2001) (citing *Schenck*, 519 U.S. at 376, 117 S.Ct. 855). The government's interest in facilitating building access plainly implicates public safety. *Id.* GSA contends, and I agree, that ensuring the safety and security of federal buildings is a significant governmental interest, one aspect of which is to maintain access to building entrances at all times.

However, the contested provision does not particularly further GSA's stated interest either in protecting employees and visitors or in maintaining access to the JFK Building. An agreement to indemnify and hold harmless the government does not make it any more or less likely that demonstrators will block the entrance to the building.[12] Nor does the provision significantly reduce the risk of harm to employees and visitors. Although the prospect that the permittee, the sponsoring organization, and their agents could be held liable for harm to such individuals during the course of a demonstration might be a deterrent that would perhaps cause them to

be more cautious in their actions, the same cannot be said for counterprotesters and unaffiliated demonstrators. The defendants have not demonstrated that in the absence of the provision the asserted access interests would be achieved any less effectively. Moreover, a real risk exists that this justification for the provision has a chilling effect on speech, restricting "substantially more speech than is necessary." *Wells*, 257 F.3d at 1148 (quoting *Ward*, 491 U.S. at 799, 109 S.Ct. 2746).

### 2. *Protecting Public Property*

█ GSA justifies the indemnification requirement as furthering its interest in protecting public property. But while GSA may have a right to compensation for certain expenses directly attributable to the activities of a rally, a requirement that the permittee indemnify GSA "against any and all loss, damage, claim or liability whatsoever," has not been shown on this record to be tailored narrowly enough to pass constitutional muster under public forum analysis.

Courts have held that when the cost to the speaker of using the forum location is made to depend not only on expenses for which she may be directly responsible, but also for the expenses potentially created by counter-protestors and others over whom she has no control, an unconstitutional "heckler's veto" can be created. *Invisible Empire Knights of the Ku Klux Klan v. City of West Haven*, 600 F.Supp. at 1434 (invalidating provision requiring speaker to post bond to cover costs of police protection and maintenance). *See also, Forsyth County*, 505 U.S. at 134–35, 112 S.Ct. 2395; *Invisible Empire of the*

---

**12.** If, however, the contention is that by forcing permittees to bear the costs of their activities, the indemnity provision will deter some groups from using the JFK building plaza for any protests (and thereby preserve access to the building) the goal is in plain conflict with

the First Amendment obligations of those who manage public forums and is not a permissible government interest. *Eastern Conn. Citizens Action Group*, 723 F.2d at 1056 (citing *Bullock v. Carter*, 405 U.S. 134, 145–46, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972)).

*Knights of the Ku Klux Klan v. Thurmont,* 700 F.Supp. 281, 285 (D.Md.1988).

And while courts have recognized the general principle that demonstrators may be required to pay for expenses or damage caused directly by them, they have carefully evaluated whether there is a likelihood such expenses would be incurred. In *Invisible Empire of the Knights of the Ku Klux Klan v. Thurmont,* for example, the court held that the town's request for reimbursement for clean-up costs was unconstitutional, on the ground that there was no indication the parade would cause the town to incur any clean-up costs. 700 F.Supp. at 286. A KKK representative promised that the KKK would clean up after itself, and the court stated that any "litter caused by spectators unaffiliated with the KKK should be the responsibility of the Town and not the KKK." *Id.* Implicit in the case was the suggestion that the KKK could have been required to compensate the town for any clean-up expenses resulting from its direct actions.

The scope of GSA's "protecting public property" justification to support the indemnification/hold harmless provision does not follow this distinction in the case law. A more narrowly tailored provision limiting the permittee's liability to harm caused by the actions of the permittee, the sponsoring organization, and individuals acting pursuant to the organizer's authority would be more appropriate, because it would not expose the permittee to liability for the actions of people not affiliated with the organization. *See generally, NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). GSA's legitimate goal in seeking to avoid damage to public property can be achieved by means that work a significantly lesser burden upon free speech rights. Rather than imposing blanket liability on the permittee for the actions of potentially unaffiliated third parties, GSA can pursue exist-

ing civil and criminal sanctions against the individuals who actually damage public property. *See Schneider v. State,* 308 U.S. 147, 162, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (proposing punishment of "those who actually throw papers on the street" as alternate means of preventing littering rather than banning leafletting); *Martin v. City of Struthers,* 319 U.S. 141, 148, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (ordinance banning door-to-door distribution of literature was not narrowly tailored; "city can punish those who call at a home in defiance of the previously expressed will of the occupant and, in addition, can by identification devices control the abuse of the privilege by criminals posing as canvassers"); *Eastern Conn. Citizens Action Group,* 723 F.2d at 1057 ("state's concern [regarding] damage claims from neighboring landowners ... may be addressed through existing civil and criminal sanctions for trespassing, vandalism, and so on"); *Collin v. Smith,* 578 F.2d at 1209 (government could more narrowly serve its interest in safety by criminalizing conduct which causes injury to persons or property and by arresting violators of its criminal laws).

By focusing upon traditional particularized mechanisms for protecting public property, GSA can not only more narrowly tailor the financial burden on First Amendment expression, it can also avoid the prohibition against vicarious liability for nonviolent exercise of protected activity.

### 3. *Shielding Government from Liability*

Ultimately, GSA seeks through its indemnification/hold harmless provision to shift to users the costs of maintaining a designated public forum. But the record before me demonstrates that the provision is, in actual operation, largely bureaucratic paper pushing in this regard. GSA ac-

knowledges that it has never enforced the provision to hold any permit holder personally liable for any damage.[13] Moreover, it appears that GSA not only does not enforce its indemnification/hold harmless provision, it does not take any care to see that it is enforceable. There is evidently no examination of the creditworthiness of the applicant, making it possible to evade the purpose of the requirement by simply finding a judgment-proof individual to sign the permit application. This apparently is what occurred in Chicago where the Americans to Keep Elian Free rally organizers had a member of their group who was judgment-proof execute the indemnification/hold harmless provision.

But the practice of bureaucratic paper pushing and the hollow threats which on closer analysis it portends can nevertheless chill the exercise of first amendment rights. The prospect remains that GSA may at some point for the first time actually pursue a signatory for costs over which the signatory has no direct control. This prospect may cause those, like Courtemanche, who are indisposed to engage in the ruse of finding a judgment proof signatory to draw back from the public forum GSA purports to have designated.

To the degree that the indemnification/hold harmless provision is meant to impose additional responsibility beyond what the traditional principles of tort law provide, it is tailored to take public responsibility out of the public forum. But cities do not condition use of public ways on the execution of indemnification/hold harmless provisions. The traditional principles of tort liability, including vestiges of sovereign immunity and other specific limitations on governmental liability, are the accepted accommodation between the traditional availability of public amenities and concern the sovereign not be unduly burdened for providing them. The government cannot properly reallocate its due burden by conditioning use of public facilities on the assumption of that burden by others without narrowly tailoring the reallocation to minimize the chilling effect on constitutional rights. There is no indication in this record that GSA has done so with its all encompassing indemnification/hold harmless provision.

### 4. *Disparate Impact on the Indigent*

No doubt because the indemnification/hold harmless provision is at once all encompassing and imprecise, there is no recognition of the need to accommodate permit applications by those with limited means. In the absence of something other than an *in terrorem* sense of what the financial obligation might be for executing the indemnification/hold harmless provision, a putative permittee can make no judgment about and seek no relief from her inability to afford the cost of using the public forum. Yet, case law has recognized an indigency exception from financial responsibility provisions in applications to use public fora. In *Collin v. Smith* and *Eastern Conn. Citizens Action Group,* the would-be permittees showed that either they could not afford or could not obtain the liability insurance required as a condition of use. Upon such a showing, the courts concluded that the requirement was unconstitutional as applied, while declining to rule that insurance requirements were unconstitutional per se. *Collin v. Smith,* 578 F.2d at 1208 ("we do not need to determine now that no insurance require-

---

13. In 1985 the GSA apparently did apply funds from a $1000 guarantee deposit it held to pay for clean-up costs following a sports event held on federal property in Philadelphia, Pennsylvania. The sponsors of the sports event signed the indemnification clause and the GSA had an endorsement on a $10 million event insurance policy in connection with the event, although GSA did not make a claim on the policy.

ment could be imposed in any circumstances, which would be a close question, in our view"); *Eastern Conn. Citizens Action Group,* 723 F.2d at 1057 ("Nor do we suggest that DOT's fee and insurance requirements would not be valid when reasonably applied."); *see also Invisible Empire Knights of the Ku Klux Klan v. City of West Haven,* 600 F.Supp. at 1435 (finding bond requirement unconstitutional as it applies to those unable to obtain a bond); *Collin v. O'Malley,* 452 F.Supp. 577, 579 (N.D.Ill.1978) (noting that plaintiff, as well as other "persons, groups or organizations espousing controversial political or social views and ideas," cannot obtain this level of coverage in the insurance marketplace).

The record evidence is thin on the question whether Courtemanche could afford insurance to cover the indemnification/hold harmless provision. In her affidavit, Courtemanche asserts conclusorily that she made inquiries regarding the availability of insurance and it appeared that insurance would be too expensive and not available in time for the rally. However, at her deposition Courtemanche stated that she had never heard of event insurance until after the rally. While she contends that Americans to Keep Elian Free did not have sufficient funds to obtain liability insurance coverage, she acknowledged in her deposition that she did not know how expensive it was to obtain. With nothing in the record to compare Courtemanche's resources against the financial demands the indemnification/hold harmless provision would impose, there exists a genuine issue of material fact whether those demands burden the expressive activities of those without sufficient financial means more than is necessary to achieve legitimate governmental interests.

■ 3. *Alternatives for Communication*—GSA argues with respect to the third *Forsyth County* factor that the indemnification/hold harmless provision does not foreclose a channel of communication, because it only requires that "someone wishing to use federal property as one place to communicate be ready to pay for any damage that results from that activity." However, if the challenged provision results in a potential permittee declining to apply for fear of overbroad personal liability, as arguably occurred in the present action, it does foreclose a venue for communication that would otherwise be available.

The rally did, of course, occur as scheduled on May 10, 2000, on city property adjacent to the JFK Building. However, Courtemanche argues that she is entitled to protest federal action on federal property designated as a public forum. It is true that the location of a demonstration may be "an essential part of the message sought to be conveyed," as well as "essential to communicating with the intended audience." *Nationalist Movement v. City of Boston,* 12 F.Supp.2d 182, 192 (D.Mass. 1998); *see also Schneider v. New Jersey,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939) ("one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place"). Nevertheless, it appears that—only because the City of Boston apparently does not burden the exercise of First Amendment rights with onerous licensing requirements involving acceptance of open ended financial responsibility—in this setting, the indemnification/hold harmless provision did not foreclose adequate alternative channels of communication for the message to be conveyed to its intended audience.

### IV. CONCLUSION

For the reasons set forth more fully above, I conclude:

(1) That the claim the Judicial Proceedings Clause is unconstitutional is not ripe;

(2) That the plaintiff has standing to contest her claim, which is not moot, concerning the constitutionality of the indemnification/hold harmless provision; and

(3) That given the assumption that the JFK Building Plaza is a public forum, there are genuine issues of material fact as to the constitutionality of the indemnification/hold harmless requirement on its face and as applied to plaintiff sufficient to prevent summary judgment treatment on this record.

Accordingly, defendant's motion for summary judgment is ALLOWED as to the judicial proceedings clause and DENIED as to the indemnification/hold harmless provision.