Grace C. OSEDIACZ, Plaintiff,

v.

CITY OF CRANSTON, by and through its Treasurer, Randy ROSSI, Stephen P. Laffey, individually and in his official capacity as Mayor of the City of Cranston, Defendants.

C.A. No. 03–600S.

United States District Court, D. Rhode Island.

Nov. 15, 2004.

Amato A. DeLuca, Esq., Miriam Weizenbaum, Esq., Michael T. Eskey, Esq., DeLuca & Weizenbaum, Ltd., Providence, RI, for Plaintiff.

Steven Frias, Esq., Zizik, Powers, O'Connell, Spaulding & Lamontagne, P.C., Providence, RI, Jametta O. Alston, Esq., Cranston, RI, Tom Marcelle, Esq., Delmar, NY, for Defendants.

## DECISION AND ORDER

SMITH, District Judge.

In the winter of 2003, the City of Cranston ("the City") opened the front lawn of Cranston City Hall ("City Hall") as a limited public forum for the display of holiday and seasonal decorations. The first displays to appear on the lawn included a menorah and a creche. Grace C. Osediacz, a citizen of Cranston and the plaintiff in this matter ("Plaintiff"), considered the

placement of these displays on the City Hall lawn to be a demonstration of support of religion by the City and its Mayor. She brought this action against the City, Cranston Mayor Stephen P. Laffey ("the Mayor"), and Cranston Treasurer Randy Rossi (collectively, "Defendants"), alleging violations of the First Amendment of the United States Constitution.[1] Specifically, Plaintiff alleges that Defendants violated the Establishment Clause of the First Amendment by allowing the display of religious items on the front lawn of City Hall. She also independently challenges the written policy ("the Policy"), pursuant to which the religious and other holiday items were allowed to be displayed, as violating the Free Speech Clause of the First Amendment.[2]

Defendants have moved for summary judgment on both claims. For the reasons discussed below, summary judgment is granted for the Defendants as to the Establishment Clause count and denied as to the Free Speech Clause count. Furthermore, because the Free Speech Clause count presents a pure question of law, and because there are no material facts in dispute, the Court moves *sua sponte* to grant summary judgment on that count in favor of Plaintiff. *See Berkovitz v. Home Box Office, Inc.*, 89 F.3d 24, 29 (1st Cir.1996) ("It is apodictic that district courts have the power to grant summary judgment *sua sponte*.").

### I. Facts

The following facts are undisputed, except as noted.[3] To the extent any facts

1. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (making First Amendment applicable to the states through the Fourteenth Amendment).

2. In her complaint, Plaintiff also challenged the Policy on Establishment Clause and due process grounds. Because this Court grants summary judgment in favor of Plaintiff on the

basis of her free speech claim, Plaintiff's other grounds for challenging the Policy need not be addressed.

3. (*See generally* Pl.'s Compl. at 4; Defs.' Ex. C–P; Defs.' Undisputed Facts at 5; Pl.'s Opp. at 5, 9; Defs.' Summ. J. Mot. at 8; Defs.' Answer at 3.)

are in dispute, they are set out in the light most favorable to Plaintiff for purposes of the Defendant's motion.

In December 2003, the City issued a written policy that read:

From the Desk of Mayor Steve Laffey

### Policy regarding Holiday and Seasonal Decorations

1. Appropriate* holiday and seasonal decorations may be erected from December 5—January 1st of each year.
2. Displays may be located only on the South facing lawn of City Hall (Park Avenue side).
3. Cranston City Hall lawn serves as a limited public forum open for the purpose of appropriate seasonal and holiday displays.
4. A prerequisite to placing displays is leaving a name, phone number, and address in case the City must contact the displayer, along with a brief written description of the appropriate holiday and seasonal decoration. A waiver must also be signed agreeing that the City of Cranston will not be held responsible for any damage that may occur to the erected holiday and seasonal display. This waiver must be signed before any display may be erected.
5. The City will not be liable for damage to a display or for injury to people placing or removing displays.
6. Because space is limited, if the lawn becomes too crowded prior to the end date for the displays, the City may limit duplicate displays or restrict further displays.
7. The Mayor or his designee must approve all holiday and seasonal decorations.

* Appropriate is defined as being suitable and proper for the holiday occasion.

The display cannot shock the consciousness of the community.

(Pl.'s Compl. Ex. 1.) Also in December 2003, Mayor Laffey issued a press release inviting the public to display "appropriate holiday and seasonal displays" on the lawn at the entrance to City Hall. (*Id.* ¶ 13; Defs.' Reply Decl. ¶ 20.) Following the issuance of this public invitation, a number of citizens placed displays on the City Hall lawn.[4] In reviewing the entire display for the presence of an Establishment Clause violation, this Court looks to the scene as it was at the time of the filing of Plaintiff's Complaint. *See ACLU v. Schundler,* 168 F.3d 92 (3d Cir.1999) (including in Establishment Clause analysis a sign that was placed near a challenged holiday display after ACLU complained to city but before complaint was filed with court).

The front lawn of City Hall covers an area approximately ten car-lengths by three car-lengths. A large evergreen tree, apparently lighted each December, occupies the center of the lawn. The following displays had been placed by citizens either on the front lawn itself or by the entrance to City Hall at the time of the filing of the Complaint: a menorah approximately five feet in height, placed by Chabad of West Bay, a Jewish group, and accompanied by a sign that read: "Chabad wishes you a Happy Chanukah"; an inflatable snowman and Santa Claus approximately seven feet tall; an almost life-size nativity scene; a three-foot holographic angel; fifteen pink flamingos with Santa hats with a plaque that read in part: "Church of the Pink Flamingo"; two plastic snowmen; a four-foot by six-foot sign from the Teamsters Union that read: "Happy Holidays from the Teamsters Union"; and three Santa "snowmen doggies."

---

4. Photographs of the various displays placed on the lawn are contained in the Appendix to this Decision and Order.

An 8–inch × 11–inch disclaimer was also posted on the entrances to City Hall and on bulletin boards inside the building. (*See* Defs.' Answer at 5.) The disclaimer read:

Notice:

Holiday Decorations

The public holiday displays are strictly from private citizens or groups. They in no way represent an official view of the City of Cranston nor are they endorsed by the City.

(Osediacz Aff. Ex. C.)

On December 21, the forum was closed (meaning no more displays could be placed) and on December 22, Plaintiff filed her complaint.

## II. *Standard of Review*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When a motion for summary judgment is directed against a party that bears the burden of proof, the movant bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If that showing is made, the nonmovant then bears the burden of producing definite, competent evidence to rebut the motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mack v. Great Atl. & Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir. 1989). In other words, the nonmovant is required to establish that there is sufficient evidence to enable a jury to find in its favor. *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997).

Because this case also involves entry of *sua sponte* summary judgment on a part of Plaintiff's claim, a brief sketch of the standard of review for cross-motions for summary judgment is appropriate.[5] "Cross motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Group, Inc. v. Ferre Dev., Inc.,* 241 F.3d

---

5. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed.1998) (discussing cross-motions and *sua sponte* summary judgment in same section). Wright, Miller & Kane point out that:

> Entering a judgment when there has been a motion but no cross-motion is somewhat different from the situation in which neither party has moved under Rule 56 and the court wishes to act sua sponte. When there has been a motion but no cross-motion, the judge already is engaged in determining whether a genuine issue of material fact exists and the parties have been given an opportunity to present evidence designed either to support or refute the request for the entry of judgment.

*Id.* In anticipation of the possibility of the Court entering summary judgment on Plaintiff's free speech claim, the Court provided Defendants notice of its intention to grant *sua sponte* summary judgment to Plaintiff on the free speech claim. *Osediacz v. City of Cranston,* C.A. No. 03–600S (D.R.I. Oct.18, 2004) (order notifying parties that Court was considering possibility of granting *sua sponte* summary judgment on free speech claim). Defendants responded with a letter brief on October 29, 2004. (Letter of 10/28/04 from Jametta O. Alston, Cranston City Solicitor, to the Court (hereinafter "Defs.' Letter Br.").)

103, 107 (1st Cir.2001) (citing *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir.1996)).

### III. Analysis

#### A. The Establishment Clause Claim

■ The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. In the seminal case of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court set out a test for evaluating Establishment Clause claims. Under *Lemon*, the Court looks to whether the state action: (1) has a secular purpose; (2) has the effect of advancing or inhibiting religion; and (3) fosters an excessive government entanglement with religion. *Id.* at 612–13, 91 S.Ct. 2105; *see Boyajian v. Gatzunis*, 212 F.3d 1, 4 (1st Cir.2000).[6] This Court will evaluate the City's holiday display as to each of these factors.

#### 1. Purpose

■ A government program may be found unconstitutional because it has a religious purpose. The bar, however, is a high one. "The [Supreme] Court has invalidated legislation or governmental ac-

tion on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations." *Lynch v. Donnelly*, 465 U.S. 668, 680, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). This is especially true where, as here, the allegation is that a religious purpose was behind the creation of a "limited public forum," that is, a place where private speakers are given the opportunity to express themselves on a certain topic.[7] *See Westside Comty. Schs. v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (opinion of O'Connor, J.) ("[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.") (emphasis in original).

The celebration of the winter holiday season constitutes a valid secular purpose. *Lynch*, 465 U.S. at 681, 104 S.Ct. 1355 ("The display [of the creche] is sponsored by the city to celebrate the Holiday and to depict the origins of that Holiday. These are legitimate secular purposes."). Because the City has proffered just such a valid secular purpose,[8] Plaintiff must produce competent evidence to show that the

---

6. Because the Court finds no evidence of entanglement (as discussed below), whether entanglement is an element of the effects prong or an independent factor is not material. *Cf. Rojas v. Fitch*, 127 F.3d 184, 188 (1st Cir. 1997) (stating that *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), "incorporated the entanglement prong into the effects calculus, thereby making the third prong of *Lemon* a part of the second prong").

7. The Supreme Court has divided public property into three categories: the traditional public forum, the designated public forum, and a third category "which is not by tradition or designation a forum for public communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). "A sub-category of the designated public forum is the 'limited

public forum.' " *Courtemanche v. GSA*, 172 F.Supp.2d 251, 265 n. 6 (D.Mass.2001). "When the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech. The State may be justified 'in reserving [its forum] for certain groups or for the discussion of certain topics.' " *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)).

8. (Defs.' Stmt. Undisp. Facts ¶ 4, 10 ("[T]he City had received various requests from citizens to celebrate the winter holidays.... The City created a limited public forum for the public to decorate City Hall Lawn with appropriate seasonal and holiday displays.").)

creation of the limited public forum was a sham designed to facilitate the display of religious items while shielding the City from charges of endorsement. "When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is, of course, entitled to some deference." But it is nonetheless the duty of the courts to "'distinguis[h] a sham secular purpose from a sincere one.'" *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (quoting *Wallace v. Jaffree*, 472 U.S. 38, 75, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)).

To support her claim that the institution of the limited public forum in this case was indeed a sham, Plaintiff cites the timing of events surrounding the establishment and implementation of the limited public forum. Plaintiff points out that the first two displays that appeared on the lawn were a menorah and a creche. She asserts that this was demonstrably in accordance with the Mayor's and the City's purported religious purpose because neither Mayor Laffey nor the City felt any need to disclaim the apparent connection between the City and the religious displays, or ensure wide distribution of the Policy inviting additional private displays, until after they were made aware of the pending complaint in this case. Plaintiff's conspiracy theory, however, does not stand up to scrutiny.

Plaintiff cites a memorandum from Mayor Laffey to Paul Grimes ("Grimes"), Cranston Director of Administration, which directs Grimes to:

> Please ensure that my policy regarding holiday and seasonal decorations is adhered to and readily available to the public. Furthermore, please post publicly a notice of disclaimer that indicates that all displays are provided by private members of the community and are in no way paid for or provided by the City of Cranston.

(Pl.'s Opp. Ex. 1.) The copy of the memorandum that Plaintiff submitted to the Court in her opposition papers bears the date "12/15/2003," which, Plaintiff claims, demonstrates that the Policy was not readily available to the public, and that the disclaimers were not posted, until 15 December—ten days after the first religious display (the menorah) was placed on the lawn. If this were true, or even possible, it would arguably create a factual dispute that would have to be resolved at trial. However, the Defendants have submitted substantial (and unrebutted) evidence that the date on the copy of the memorandum submitted to the Court is not the date of the memorandum's issuance, but rather the date it was printed and given to the representative of the ACLU.

First, Robin Muksian–Schutt ("Schutt"), Cranston Deputy Director of Administration, states that the City adopted the Policy no later than December 4, 2003, and that the Policy went into effect on December 5, 2003. (Reply Decl. of Robin Schutt ¶ 5.) Schutt goes on to state that she e-mailed the memorandum at issue here to Grimes, on behalf of Mayor Laffey, on December 4, 2003. (*Id.* ¶ 11.) She further states that "[u]nder the City's computer system, the date that appears on a memo is the date that the memo was accessed and printed" (*id.* ¶ 14), and that the date on the copy of the memorandum presented to the Court by Plaintiff represents the date on which a copy of the memorandum was printed for Plaintiff (*id.* ¶ 15). In support of this contention, Schutt includes in her declaration: (1) a copy of the memorandum identical to the one Plaintiff presented to this Court except for the fact that it is dated "8/23/2004," the date on which Schutt declares she printed the document as an example for this Court (*id.* ¶ 17); and (2) a printout of a computer screen she represents as displaying the document properties of the memorandum, which shows the memorandum as having

been created and last modified on 4 December (*id.* Ex. A). Grimes also made a declaration stating that the Policy went into effect December 4, 2003, and that he received the memorandum at issue here on that same date. (Reply Decl. of Paul Grimes ¶ 9, 12.)

At the hearing on this motion, Plaintiff argued that this Court could not take cognizance of the above-referenced Reply Declarations without granting Plaintiff a further opportunity to respond. This Court agreed, and granted Plaintiff such opportunity. *See Vais Arms, Inc. v. Vais,* 383 F.3d 287, 292 (5th Cir.2004). ("[T]hose circuits that have expressly addressed this issue have held that a district court may rely on arguments and evidence presented for the first time in a reply brief as long as the court gives the nonmovant an adequate opportunity to respond.") (citing *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 410 (1st Cir.1985) ("We believe that as the nonmoving party, Caribe should have had an opportunity to examine and reply to the moving party's papers before the court considered them in its decision process.")). Plaintiff's only submission, however, was an affidavit to the effect that a representative of the ACLU had obtained the version of the memorandum Plaintiff presented to this Court from City Hall on December 15, 2003. (Brown Suppl. Aff.) This fact is completely consistent with, and in fact supports, Defendants' explanation of the December 15 date on Plaintiff's version of

the memorandum. Given the high bar Plaintiff must pass over to establish a religious purpose in a case such as this, the failure to produce any evidence to rebut Defendants' proffer ends the matter. But there is more.

Even if this Court were to accept Plaintiff's theory about the timing of the memorandum, her argument still falls short of the mark. This is because even before 15 December, non-religious holiday displays were present on the front lawn of City Hall, consistent with the invitation to the public to place holiday items there. On December 9, 2003, a seven-foot inflatable snowman and Santa Claus were placed at the east and west sides of the entrance to City Hall. (*See* Defs.' Summ. J. Mot. at 7; Pl.'s Opp. at 5; Defs.' Ex. C-4 (executed waiver dated Dec. 9, 2003)). At oral argument, Plaintiff's counsel acknowledged that placement of the Santa and snowman preceded the placement of the creche. (Tr. at 67.) While it is true that these items were not as centrally located on the lawn as the menorah and the creche, their presence undercuts Plaintiff's assertion that the "evolution of the display at issue forces this Court to entertain the conclusion that the display was intended to be religious at its inception." (Pl.'s Opp. at 11.) Plaintiff's reliance on the locations of the creche and menorah as compared to the Santa and snowman is too thin a reed to support her claim.[9]

The fact is that Christmas is a holiday with both religious and secular overtones.

---

**9.** Nor does a reference to "the holiday" in a memorandum from Grimes to Mayor Laffey dated December 21, 2003, suggesting a closure of the forum due to crowding, imply any religious, as opposed to secular, purpose. (*See* Defs.' Ex. Q ("The community has had a couple of weeks to respond to your invitation, and they have done so very positively. On the eve of the holiday, I reckon that we have seen all the decorations that will be offered by the community.").) Plaintiff assumes this reference to "the holiday" is a reference to Christ-

mas Day. It could also be a reference to the Winter Solstice, which fell on 22 December, *see* Jack Williams, *Answers: When do the seasons begin,* at http://www.usatoday.com/weather/resources/askjack/ 2003-12-21-answers-season—x.htm (last visited Nov. 3, 2004), or New Year's Day. Even if it is a reference to Christmas Day, it should be noted that many people quite likely view Christmas Day as representing the end of the winter holiday season from a secular, not religious,

*Lynch,* 465 U.S. at 692, 104 S.Ct. 1355 (O'Connor, J., concurring) ("[Christmas] has very strong secular components"). And, as in *Lynch,* the City's display of the creche and menorah in combination with the snowman, the Santa, and the large lighted tree implies nothing more than a celebration of the holiday in both its religious and secular senses. The Supreme Court noted in *Lynch* that it was error for the District Court (then-Chief Judge Pettine of this District) to draw an inference of no secular purpose solely from the presence of a creche. 465 U.S. at 681, 104 S.Ct. 1355. This Court will not repeat that error here. Nothing in *Lynch* or its progeny suggests even remotely that a holiday display, either sponsored by the City or allowed to be displayed on City property, must be sanitized of all religious content in order to be constitutional.

Finally, the invitations to the public to use the lawn reveals no overt or covert religious purpose. In fact, the opposite is true. The press release issued by the Mayor's office relating to the creation of the City's limited public forum, distributed on 4 December, read as follows:

> Mayor Laffey has announced that beginning tomorrow in light of the holiday season, he welcomes the people of Cranston to place appropriate holiday and seasonal displays on the front lawn of City Hall. "It's a great time of year, and we have much for which to be thankful," said Laffey.
>
> "I want to look out the window of my office and see Rudolph pulling a sleigh," stated the Mayor. Laffey added that he hopes to have people create ice sculptures after a big snowstorm. "If we have enough, maybe we can have a contest for the best one," he commented. "But the challenge that I really look forward to is a friendly snowball fight among members of the City Council, the School Administration and myself. I'm a little bit hesitant, though, because I know how well some of them sling mud!" He said laughingly.

(Schutt Reply Decl. ¶ 20.) Plaintiff does not dispute either the date of distribution or contents of the press release.[10] Noth-

point of view. In the Catholic Church (and presumably most Protestant Christian denominations), the Christmas season extends for twelve days beyond the date of the birth of Christ. *See* Dennis Bratcher, *The Twelve Days of Christmas,* Christian Resource Institute, *at* http://www.cresourcei.org/cy12days.html (last visited Nov. 3, 2004) ("in the Western Church [the Twelve Days of Christmas] are the twelve days from Christmas until the beginning of Epiphany (January 6th ....)"). Even assuming it is a reference to Christmas as a religious holiday, this fact ultimately does nothing to change this Court's conclusion. Like the location of the menorah and creche, this reference to "the holiday" cannot support the argument Plaintiff seeks to rest upon it.

Moreover, regardless of the exact day to which "the holiday" refers, the date of this memorandum adds yet another nail to the coffin of Plaintiff's theory that the public was not notified of the limited public forum until after Plaintiff complained, by stating on 21 December that "the community has had a *couple of weeks* to respond to your invitation." (Defs.' Ex. Q (emphasis added).)

10. It is noteworthy that in the four-month discovery period (*see* Pretrial Order of Mar. 18, 2004 (setting close of discovery for July 19, 2004)), which was allowed at Plaintiff's request, Plaintiff did not make any document requests of Defendants nor conduct any depositions (*see* Defs.' Summ. J. Mot. at 11 n. 3). Clearly, the burden is on the Defendants at this stage of the proceeding, but Plaintiff also has a burden to meet Defendants' proffers. Plaintiff proceeds at her own peril if she does nothing to ascertain the facts and then claims that her uncertainty as to the veracity of Defendants' submissions constitutes material facts in dispute. *See Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990) ("[A] 'genuine' issue exists if there is 'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.' ")

ing in these public statements or in the actual implementation of the Policy reveals or even remotely supports an inference that a religious purpose was behind the creation of the limited public forum.

Having concluded that no material factual dispute exists with respect to the purpose prong of the *Lemon* test, the Court turns to the question of whether the display has the effect of endorsing religion nonetheless.

### 2. *Effect/Endorsement*[11]

■ In evaluating Establishment Clause challenges of government action involving the display of winter holiday items (some of which are religious in nature) under *Lemon's* second prong, the benchmark is set by two Supreme Court cases, *Allegheny v. ACLU* and *Lynch v. Donnelly*. *Lynch* involved a holiday display in the nearby Rhode Island community of Pawtucket. The display consisted of "many of the figures and decorations traditionally associated with Christmas." *Lynch*, 465 U.S. at 671, 104 S.Ct. 1355. Included in the display was "a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such charac-

ters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that reads 'SEASONS GREETINGS,' and [a] creche." *Id.* Applying the *Lemon* test, the Supreme Court upheld the constitutionality of the display in the face of an Establishment Clause challenge.

Approximately five years after *Lynch*, the Supreme Court ruled on two separate holiday displays in *Allegheny*. The first, which the Court found violated the Establishment Clause, was situated inside the Allegheny County Courthouse—specifically, on its Grand Staircase, "[t]he 'main,' 'most beautiful,' and 'most public' part of the courthouse." *Allegheny*, 492 U.S. at 579, 109 S.Ct. 3086. This display consisted primarily of a creche with a banner reading: "Gloria in Excelsis Deo!" *Id.* at 580, 109 S.Ct. 3086. Nearby the display were several poinsettia plants and small evergreen trees, but "[n]o figures of Santa Claus or other decorations." *Id.* at 580–81, 109 S.Ct. 3086. The second display, which the Court upheld, was "just outside the City–County Building." *Id.* at 578, 109 S.Ct. 3086. This display consisted of an 18–foot menorah, a 45–foot decorated Christmas tree, and a sign that stated: "During this holiday season, the city of

(quoting *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975)).

**11.** The "endorsement test" is a refinement of the *Lemon* test promulgated by Justice O'Connor. *See County of Allegheny v. ACLU,* 492 U.S. 573, 668, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Kennedy, J., concurring and dissenting in part) ("the endorsement test … had its genesis in Justice O'Connor's concurring opinion in *Lynch* "); *see also id.* at 592, 109 S.Ct. 3086 ("In recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence."); *Boyajian,* 212 F.3d at 6 (describing second prong of *Lemon* as examining whether "the practice under review has the 'principal or

primary effect' of endorsing or disapproving religion") (quoting *Wallace v. Jaffree,* 472 U.S. 38, 55, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)). The endorsement test asks whether a reasonable observer "would view a governmental practice as endorsing religion." *Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 777, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring). "As a theoretical matter, the endorsement test captures the essential command of the Establishment Clause, namely, that government must not make a person's religious beliefs relevant to his or her standing in the political community by conveying a message 'that religion or a particular religious belief is favored....' " *Allegheny,* 492 U.S. at 627, 109 S.Ct. 3086 (O'Connor, J., concurring) (quoting *Wallace,* 472 U.S. at 70, 105 S.Ct. 2479 (O'Connor, J., concurring)).

Pittsburgh salutes liberty. Let these festive lights remind us that we are keepers of the flame of liberty and our legacy of freedom." *Id.* at 582, 109 S.Ct. 3086.

Courts frequently have compared challenged holiday displays like the one in this case to those in *Lynch* and *Allegheny.* The constitutionality of the challenged display then hinges on whether it bears a greater resemblance to the constitutional or unconstitutional displays in those cases. *See, e.g., Schundler,* 168 F.3d at 107 (upholding constitutionality of holiday display because, "we are unable to perceive any meaningful constitutional distinction between the display at issue here and those that the Supreme Court upheld in *Lynch* and *Allegheny* "). The City, however, urges this Court not to evaluate the display at issue here by means of comparison to the displays in *Lynch* and *Allegheny.* Rather, it cites *Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), for the proposition that the City Hall display should be subject to a much less stringent review because this is a public forum case involving private speakers, while *Lynch* and *Allegheny* involved the government as speaker.

In *Pinette,* a plurality of the Court argued for a bright line exception to the Establishment Clause prohibition. The exception would have precluded finding a violation any time the challenged speech was that of a private citizen. *Id.* at 770, 115 S.Ct. 2440 (opinion of Scalia, J.) ("Religious expression cannot violate the Establishment Clause where it (1) is purely private and (2) occurs in a traditional or. designated public forum, publicly announced and open to all on equal terms."). However, where the Supreme Court issues a splintered majority opinion, as in *Pinette,* "we must examine the positions taken by the Justices needed to form a majority and follow the opinion that supports the majority position on the narrowest grounds." *Schundler,* 168 F.3d at 103. While four Justices in *Pinette* supported a private speech exception, both Justice O'Connor and Justice Souter filed concurring opinions explicitly refusing to adopt such an exception. 515 U.S. at 775, 115 S.Ct. 2440 (O'Connor, J., concurring) ("I see no necessity to draw new lines where '[r]eligious expression ... (1) is purely private and (2) occurs in a traditional or designated public forum.' "); *id.* at 787, 115 S.Ct. 2440 (Souter, J., concurring) ("Unless we are to retreat entirely to government intent and abandon consideration of effects, it makes no sense to recognize a public perception of endorsement as a harm only in that subclass of cases in which the government owns the display.").

Thus, the fact that this case involves private speakers, while relevant, is not dispositive. The status of the lawn as a limited public forum where private speech took place is simply one additional factor to consider in the Establishment Clause analysis. *Id.* at 775, 115 S.Ct. 2440 (O'Connor, J., concurring) ("That the religious display at issue here was erected by a private group in a public square ... certainly informs the Establishment Clause inquiry...."). This Court understands this guidance to mean that even where private speakers are involved, the *Lynch/Allegheny* line of cases is still the first mark against which a relevant display is measured. If the holiday display can survive an Establishment Clause challenge under this standard, the inquiry ends. If, however, a display falls short of the *Lynch/Allegheny* standard on its face, a court may still determine that its private character constitutes an additional factor in favor of non-endorsement sufficient to keep the display on the constitutional side of the Establishment Clause line.

As noted above, this Court evaluates the display as it looked at the time of the filing

of Plaintiff's Complaint. The scene on the lawn of City Hall at that time more clearly resembles the displays held to withstand Establishment Clause challenge in both *Lynch* and *Allegheny* than the one found to be unconstitutional in *Allegheny*. While the two religious displays were prominent, the non-religious displays and the large lighted evergreen tree in the center of the lawn all add to the "secularization" of the display.[12] *See Allegheny*, 492 U.S. at 633, 109 S.Ct. 3086 (O'Connor, J., concurring) ("[T]he Christmas tree, whatever its origins, is not regarded today as a religious symbol."); *Schundler*, 168 F.3d at 107 (contemplating that " 'a display containing only a menorah and a Christmas tree' may be constitutional"). Finally, the City posted several disclaimers. The use of such disclaimers to further mitigate the religious effect of a display has been held to be a relevant factor in Establishment Clause analysis. *See ACLU v. Wilkinson*, 895 F.2d 1098, 1105 (6th Cir.1990) ("If a 'salute to liberty' sign [like the one in *Allegheny* ] can help negate any implication of an endorsement of religion, it seems to us that a sign explicitly denying any endorsement of religion ought to help even more."); *see also Pinette*, 515 U.S. at 776, 115 S.Ct. 2440 (O'Connor, J., concurring) ("[A] disclaimer helps remove doubt about state approval of [a] religious message."). While the disclaimers in this case could have been larger and better placed so as to be visible from the road, they clearly disavowed any government endorsement and were readily apparent to anyone visiting City Hall. Therefore, their presence constitutes an additional factor in favor of finding no endorsement of religion.

Finally, the fact that the City Hall lawn was designated as a limited public forum

**12.** Neither the proximity of the religious displays to City Hall, nor the fact that City Hall occupies a position between a public school and a school administration building, require any contrary conclusion. While the proximity of a religious display to a seat of government may increase the possibility for a message of religious endorsement to be conveyed, *see Pinette*, 515 U.S. at 804, 115 S.Ct. 2440 (Stevens, J., dissenting) ("structures on government property—and, in particular, in front of buildings plainly identified with the State— imply state approval of their message"), the front lawn of Cranston City Hall is much more like the entrance to the Allegheny City– County Building and the public park in *Lynch*, than it is to the Grand Staircase of the Allegheny County Courthouse. *See Mather v. Village of Mundelein*, 864 F.2d 1291, 1293 (7th Cir.1989) ("the presence of the display [on the lawn of the village hall] in a place open to the elements makes the context closer to that of the park in [*Lynch* ] than to that of the center of Chicago's city hall"). Furthermore, any suggestion of endorsement a reasonable observer may derive from the proximity of the religious displays to City Hall is far outweighed by the overall composition of the display.

The presence of the school buildings next door to City Hall also does not change the result of this analysis, because the impressionability of schoolchildren is a factor of limited concern where the Establishment Clause challenge involves private speakers conveying a religious message on non-school grounds. *See Good News Club*, 533 U.S. at 115, 121 S.Ct. 2093 ("[W]hatever significance we may have assigned in the Establishment Clause context to the suggestion that elementary school children are more impressionable than adults, we have never extended our Establishment Clause jurisprudence to foreclose private religious conduct during nonschool hours merely because it takes place on school premises where elementary school children may be present.") (internal citation omitted); *id.* at 116, 121 S.Ct. 2093 ("[While] we did note [in *Edwards v. Aguillard*, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987),] that mandatory attendance requirements meant that state advancement of religion in a school would be particularly harshly felt by impressionable students .... we did not suggest that, when the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue.").

does nothing to change this conclusion. The Plaintiff urges that "while the City Hall lawn may have been used on occasion in the past for public expression, it is not a traditional public forum [and] has never been used for holiday displays." (Pl.'s Opp. at 15–16.) The fact that it has never been used for holiday displays, continues Plaintiff, means that a reasonable observer would be more likely to infer governmental endorsement of religion from the presence of religious displays on the lawn. (*Id.*) *See Pinette*, 515 U.S. at 780, 115 S.Ct. 2440 (O'Connor, J., concurring) ("[T]he reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears."). Defendants counter that the lawn in front of City Hall has a history of being used as a public forum. (Tr. at 12.) The best that can be said from Plaintiff's perspective is that the history of the forum is disputed and therefore the private nature of the speech is negated as a factor. The fact that this matter is disputed, however, is ultimately irrelevant because the Court has determined that the holiday display at issue here would pass muster under *Lynch/Allegheny* even if the City itself had set it up. In other words, if the display is constitutional as a City-sponsored display, it is impossible for it to be unconstitutional as private speech in a limited public forum.

### 3. *Entanglement*

In light of the fact that no interaction with sectarian entities is alleged in the Complaint, no reasonable fact finder could find unconstitutional entanglement of government with religion. *See Lynch*, 465 U.S. at 689, 104 S.Ct. 1355 (O'Connor, J., concurring) ("The entanglement prong of the *Lemon* test is properly limited to institutional entanglement."). Therefore, the Court need not address this issue. *See Agostini v. Felton*, 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("En-

tanglement must be 'excessive' before it runs afoul of the Establishment Clause.").

### B. *The Free Speech Clause Claim*

#### 1. *Standing*

Defendants assert Plaintiff has no standing to challenge the Policy on free speech grounds because Plaintiff never applied to set up a display and thus suffered no cognizable injury. (Defs.' Summ. J. Mot. at 21; Defs.' Letter Br. at 2.) *See Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("A federal court's jurisdiction ... can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.' ") (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). However, in First Amendment challenges such as this, traditional rules of standing, which require an injury in fact to the plaintiff, are loosened to allow citizen challenges. *See Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 647 (2d Cir.1998) ("If section 10–110 is overly broad, or lacks procedural safeguards to prevent censorship, then any citizen in New York may challenge the law."). As will be discussed in more detail further below, the Policy on its face vests unbridled discretion in Mayor Laffey to permit or deny individual displays. "[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Therefore, Plaintiff, as a citizen of Cranston subject to the Policy, has standing to challenge the Policy on First Amendment grounds without first having

to submit a display for approval. "This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

### 2. *Free Speech Analysis*

"[A]n ordinance which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official ... is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Here, the Policy on its face operates as a prior restraint on speech that grants the Mayor (or his designee) unbridled discretion to approve or deny displays. The Court will first address the issue of prior restraint.

Item 4 of the Policy states in part: "A *prerequisite* to placing displays is leaving a name, phone number, and address." (Pl.'s Compl. Ex. 1 (emphasis added).) Furthermore: "A waiver must also be signed agreeing that the City of Cranston will not be held responsible for any damage.... This waiver must be signed *before* any display may be erected." (*Id.* (emphasis added).) Item 7 of the Policy states: "The Mayor or his designee *must* approve all holiday and seasonal decorations." (Pl.'s Compl. Ex. 1 (emphasis added).) While the City contends that it was neither the intent nor the actual practice to require citizens to present their displays for approval prior to placing them on the lawn, there is nothing in the Policy that conveys this intent. The only message to be derived from the Policy on its face is one of prior restraint on speech.

Not all prior restraints on speech are unconstitutional, however. While the government may impose some prior restraints on speech "in order to regulate competing uses of public forums," such a scheme "may not delegate overly broad licensing discretion to a government official." *Forsyth County*, 505 U.S. at 130, 112 S.Ct. 2395. "The reasoning is simple: If the permit scheme 'involves appraisal of facts, the exercise of judgment, and the formation of an opinion,' by the licensing authority, 'the danger of censorship and of abridgement of our precious First Amendment freedoms is too great' to be permitted." *Id.* at 131, 112 S.Ct. 2395 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 305, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)).

As indicated above, Item 7 of the Policy states in toto: "The Mayor or his designee *must* approve all holiday and seasonal decorations." (Pl.'s Compl. Ex. 1 (emphasis added).) There is no limitation on, or qualification of, the Mayor's absolute approval authority. The Policy does reference "[a]ppropriate holiday and seasonal decorations," and defines "appropriate" as "being suitable and proper for the holiday season," and not "shock[ing] the consciousness of the community." (*Id.*) The City suggests that these qualifiers actually limit the Mayor's discretion to not approve displays. But to reach this conclusion, a reader must interpret the words and the structure of the Policy in a way that is neither logical nor grammatically appropriate.

Defendants would have this Court read the Policy to mean that any display that had a winter holiday theme would be considered "appropriate," "suitable," and "proper" for placement within the limited public forum. In addition, Defendants

would have this Court read the limitation that displays cannot "shock the consciousness of the community" as providing the only basis on which the Mayor could reject a display. However, reading the Policy as a whole, and in its logical sequence, leads to a very different conclusion: (1) that any individual wishing to put up a display must provide his or her name, address and telephone number to the City, along with a description of the display, *before* the display may be placed on the lawn (Item 4); (2) that the display must be "appropriate" (i.e. "suitable and proper") for the "holiday occasion" (Item 1); (3) that the display may not "shock the consciousness of the community" (Item *); and (4) that the Mayor or his designee *must* approve all displays and decorations (Item 7). As stated above, this reading provides no qualifier of the Mayor's approval authority. Furthermore, even if this Court were to read the Policy as limiting the Mayor's discretion as Defendants suggest, there is no indication whatsoever on the face of the Policy as to what standard or criteria the Mayor might use to determine suitability, propriety or shockingness. *See Lakewood,* 486 U.S. at 769–70, 108 S.Ct. 2138 ("To allow these illusory 'constraints' to constitute the standards necessary to bound a licensor's discretion renders the guarantee against censorship little more than a high-sounding ideal."). Defendants' after-the-fact assertion that "[a]ppropriate seasonal displays covered by the policy included, but were not limited to, Chanukah, Christmas (both secular and religious aspects), Kwanza, Winter Solstice, the New Year, and winter scenes, activities, and sports," and that the "shock the conscience" standard "simply prevented the erection of obscene and pornographic displays," (Defs.' Summ. J. Mot. at 5), provides some guidance. But these expanded definitions are not included in the Policy nor in any other document defining the terms and limits of the Policy. Thus, they are merely

argument and, in any event, do not meet the standard of *Lakewood,* which states that the "doctrine forbidding unbridled discretion ... requires that the limits the city claims are implicit in its law be made explicit." 486 U.S. at 770, 108 S.Ct. 2138.

Defendants next argue that this Court should look to the City's interpretation and implementation of the Policy so as to conclude that no displays were declined admission to the forum and Mayor Laffey's approval discretion extended only to the limits of the Policy as a whole (i.e., he could only refuse displays that were not appropriate for the holidays or shocked the consciousness of the community). In support of this contention, Defendants cite *Forsyth County,* 505 U.S. at 131, 112 S.Ct. 2395 ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."), and *Ward v. Rock Against Racism,* 491 U.S. 781, 795–96, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for '[i]n evaluating a facial challenge to a state law, a federal court must ... consider any limiting construction that a[n] .. enforcement agency has proffered.' ") (quoting *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). However, Defendants' only written "interpretation" of its Policy, if it can be called that, is the after-the-fact declaration (as opposed to a court ruling or agency pronouncement) of Cranston's Director of Administration. Furthermore, its only history of implementation consists of a sixteen-day period during the 2003 winter holiday season. *See Burk v. Augusta–Richmond County,* 365 F.3d 1247, 1256 (11th Cir.2004) (declining to find "well-established practice" where the ordinance in question had "virtually no history, having been enacted only in the

month before the instant applications"). There is simply no way of knowing what citizens, if any, were improperly dissuaded from exercising their free speech rights. *See Lakewood*, 486 U.S. at 757, 108 S.Ct. 2138 ("[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused."). The City's position on this point is strikingly similar to the argument rejected by the Supreme Court in *Lakewood:*

> The city asks us to presume that the mayor will deny a permit application only for reasons related to the health, safety, or welfare of Lakewood citizens, and that additional terms and conditions will be imposed only for similar reasons. This presumes the mayor will act in good faith and adhere to standards absent from the ordinance's face. But this is the very presumption that the doctrine forbidding unbridled discretion disallows. The doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice.

486 U.S. at 770, 108 S.Ct. 2138. Even taking all of Defendants' statements as true, absent a showing of explicit limits on Mayor Laffey's approval discretion, Defendants' motion for summary judgment on this claim not only must fail, but this Court believes that *sua sponte* summary judgment for Plaintiff is appropriate.

Where Defendants have "had *an adequate opportunity* to show that there is a genuine issue," this Court may enter summary judgment on its own motion. *National Expositions, Inc. v. Crowley Maritime Corp.*, 824 F.2d 131, 133 (1st Cir. 1987) (emphasis in original) (quoting Wright, Miller & Kane, *supra*, § 2720, at 34); *see also id.* ("a district court has the legal power to render 'summary judgment . . . in favor' of the party opposing a summary judgment motion 'even though [s]he has made no formal cross-motion under rule 56' ") (quoting Wright, Miller & Kane, *supra*, § 2720, at 29–30). Here, the Policy says what it says, and the Court takes all of Defendants' assertions in the Supplemental Declaration of Paul Grimes as true. With these as the undisputed facts of the case, this Free Speech Clause claim presents only a question of law. *See Burk*, 365 F.3d at 1250. Defendants have been given an opportunity to fully address the issue, the Court can find no disputed issues of material fact, and therefore *sua sponte* summary judgment is proper.

## IV. *Conclusion*

There is, perhaps, a degree of irony in the outcome of this case. Rather than erecting a city-sponsored display in accordance with the relatively well-established guidelines of *Lynch/Allegheny* and related cases, the Mayor of Cranston chose to create a limited public forum to celebrate the winter holidays. Defendants claim this was done because "the City wanted the people to be able to express themselves." (Defs.' Summ. J. Mot. at 4.) But when government officials choose this route, they must understand that it comes with a condition: While the government may be justified in reserving its forum for the discussion of certain topics, the "restriction must not discriminate against speech on the basis of viewpoint." *Good News Club*, 533 U.S. at 106, 121 S.Ct. 2093.

By granting the Mayor the discretion to approve or deny displays on the basis of what he deemed "appropriate" (or worse, in the exercise of unbridled discretion), the Policy did not sufficiently protect the free speech rights of Cranston's citizens. Cranstonites were left to guess whether Mayor Laffey would deem, for example, a display of a Santa and Mr. (not Mrs.) Claus wearing "Gay Pride" T-shirts, to be

an "appropriate" holiday display. A citizen wishing to express such a view of the holiday season may well censor his or her own speech rather than submit to the Mayor's discretionary approval authority after submitting his or her name, address, and a written description of the display.

If public officials are determined to take the populist approach of creating a limited public forum for winter holiday displays, they must explicitly limit any approval authority to viewpoint neutral criteria. Reserving unbridled approval authority in any one official, or imposing nebulous constraints on approval discretion (such as limiting disapproval to displays that are not "appropriate" or "suitable"), is not acceptable.

The First Amendment acts to deter state-sponsored or endorsed religious speech, while at the same time protecting the rights of the people to express themselves freely. That balance is tipped inappropriately where, as here, a government body creates a limited public forum that unduly restricts potential speakers by subjecting speech to unbridled official approval within the context of a policy of prior restraint. This is so even where the avowed purpose (and effect) of the forum was to avoid any government endorsement of religion.

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED as to the Establishment Clause claim. Furthermore, summary judgment is GRANTED in favor of Plaintiff as to the Free Speech Clause claim.

IT IS SO ORDERED.

Appendix A

Appendix B

Appendix C

Appendix D

## Appendix E

## Appendix F

Appendix G

Appendix H

Appendix I

Appendix J

Appendix K

Exhibit L

Appendix M

